1  THE GOLAN LAW FIRM
   YVETTE GOLAN
2  1919 Decatur St.
   Houston, TX 77007
3  Telephone: (866) 298 4150 ext. 101
   ygolan@tgfirm.com
4
   FLASHPOINT LAW, INC.
5  SHIRISH GUPTA (SBN 205584)
   1900 S. Norfolk Street, Suite 350
6  San Mateo, CA 94403
   Telephone: (650) 539-4019
7  sgupta@flashpointlaw.com

8  Attorneys for Plaintiff Sara Sandys

9
                  UNITED STATES DISTRICT COURT
10
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
11

12  SARA SANDYS,                          Case No. CV11-08007 JAK(PLAx)

13                         Plaintiff,      CLASS ACTION COMPLAINT

14         v.                             DEMAND FOR JURY TRIAL

15  NAKED JUICE COMPANY, a California
    corporation; PEPSICO INC., a New York
16  corporation; and DOES 1-100,
                           Defendants.
17

18

19

20        Plaintiff Sara Sandys  ("Sandys" or "Plaintiff"), by her attorneys, brings this class action

21  against Naked Juice Co., PepsiCo, Inc., and Does 1 through 100 (collectively, "Defendants"), on

22  her own behalf and on behalf of all others similarly situated, and alleges as follows based upon

23  the investigation of her counsel:

24                              INTRODUCTION

25  1.   This is a class action on behalf of a national class of consumers who purchased Naked

26  Juice products that were falsely and misleadingly labeled as not containing genetically modified

27  organisms ("GMOs") when, in fact, Defendant Naked Juice and PepsiCo knew that the

28

                                                                    COMPLAINT

beverages contained GMOs.  This is also a class action on behalf of a national class of consumers who purchased Naked Juice products that were falsely and misleadingly labeled as "100% JUICE," "100% FRUIT," "ALL NATURAL," (emphasis in original), and that were falsely claimed to contain certain vitamins, that in fact contained synthetic ingredients, including synthetic fiber (produced by Archer Daniels Midland) and chemical compounds that are not the vitamins they were claimed to be.

2.     Defendants know that its target market value and will pay more for all-natural non-GMO 100% juice beverages than conventional beverages.  Defendants know that federal agencies define "natural" as excluding – at the very least – synthetic compounds.  Defendants know that consumers similarly understand the word "natural" to exclude synthetic substances.

3.     In an effort to capture this growing demand, Defendants prominently labeled almost all its Naked Juice beverages as "non-GMO," "100% JUICE" and "ALL NATURAL" (or similar). Defendants further enticed consumers to purchase Naked Beverages by promising, on the package of every Naked Juice bottle, that the beverage contains "only the **freshest, purest** stuff in the world and [we] leave out everything else" (emphasis in original).  Defendants further enticed consumers to purchase these beverages by promising that they contain "the best bare-naked fruits."  Defendants further cultivated a healthy and socially conscious image in an effort to promote the sale of these beverages.

4.     Defendants knew their representations are false and deceptive.  More than that, Defendants intended to deceive consumers.  Defendants knew that their protein beverages contained GMOs, but intentionally duped consumers into believing the drinks were GMO-free.  Defendants actively gave consumers the false impression that the beverages' vitamin content is due to the nutritious fruits and juices, rather than added synthetic compounds such as calcium pantothenate (synthetically produced from formaldehyde).  Defendants claimed that these synthetic substances were the same as a natural vitamin or nutrient, when in fact the synthetic compound is altogether a different substance.

5.     Defendants further misled consumers into believing that some of the beverages' fiber

COMPLAINT

content is due to the "ALL NATURAL" "100% JUICE," rather than the latest advances in synthetic fibers such as Fibersol®-2 (a proprietary synthetic digestion-resistant fiber produced by Archer Daniels Midland and developed by a Japanese chemical company), fructooligosaccharides (a synthetic fiber and sweetener) and inulin (an artificial and invisible fiber added to foods to artificially increase fiber content without the typical fiber mouth-feel).

6.     Defendants inserted ***substantial*** amounts of these synthetic substances in its juices, not just trace amounts.  For example, Defendants label Blue Machine as an all-natural blueberry and blackberry 100% Juice Smoothie:



7.     On the side of the package, Defendants promise that the beverage contains three blackberries in every 15.2 oz. serving.

8.     Yet there is more Fibersol®-2 (a proprietary synthetic digestion-resistant fiber) than any ingredient even derived from blackberries.

9.     Given Defendants' front-of-package promise that the product is "ALL NATURAL" and "100% JUICE," a reasonable consumer would not assume that Defendants were being deceptive and would not know to read the very-fine-print ingredient label.

10.    Moreover, not having the specialized food chemistry and regulatory knowledge necessary to determine whether a substance is listed because it naturally occurs in juice, a reasonable consumer would interpret the fine-print ingredient label in a way to be consistent with the front-label representation.

11.    Many of the ingredients added to Defendants' beverages are "safe" as beverage

2

ingredients.  Yet Defendants did not simply claim that its beverage products are "all safe." Instead, Defendants sold consumers a bill of goods, fraudulently promising that the beverage products are "100% JUICE," "ALL NATURAL," and "non-GMO."  Even if the synthetic ingredients are safe – or even beneficial – they are still not what consumers consented to ingesting, and they are still not what Defendants warranted they were providing.

12.     Consumers lack the ability to test or independently ascertain the accuracy of a beverage label, especially at the point of sale.  Reasonable consumers must and do rely on the beverage company to honestly report the nature of a beverage's ingredients.

13.     Beverage companies intend consumers rely upon the beverage label, and reasonable consumers do in fact so rely.  The beverage label is the only available source of information consumers can use to make decisions on whether to buy and ingest bottled beverages.

14.     As a result of their false and misleading labeling, Defendants were able to sell these products to hundreds of thousands of consumers throughout the United States and to profit handsomely from these transactions.

15.     Defendants' false and misleading representations and omissions violate state and federal law, both civil and criminal, detailed more fully below, including California's Unfair Competition Law, California's Consumer Legal Remedies Act, common law, and federal statutes.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act ("CAFA").  28 U.S.C. § 1332(d).  Jurisdiction under CAFA is met because: (1) the proposed number of putative class members exceeds 100; (2) at least one plaintiff and one defendant are citizens of different states; and (3) the amount in controversy, including, but not limited to, the aggregate amount of relief sought by absent class members, exclusive of interest and costs, exceeds $5 million.

17.     This Court has personal jurisdiction over Defendants because each is a corporation or individual with sufficient minimum contacts in California or otherwise intentionally avails itself

of the laws of this State through its marketing and sales of Naked Juice products in California so as to render the exercise of jurisdiction by this Court consistent with traditional notions of fair play and substantial justice.

18.   Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this district, because Naked Juice's principal place of business is within this district, and because this Court has personal jurisdiction over all Defendants.

19.   No other forum would be more convenient for the parties and witnesses to litigate this action.

**PARTIES**

20.   Plaintiff Sara Sandys is currently a resident of Houston, TX.  In the past several years, Plaintiff purchased Defendants' Falsely Labeled Products for herself and her husband on multiple occasions from grocery stores in Houston, TX, including Kroger's, Randall's, and Whole Foods.  In the past several years, Plaintiff also ingested these products as she purchased them.  Plaintiff purchased and ingested Naked Juices juices on a regular basis, usually one or two bottles per month, and usually the flavors Green Monster, Protein Zone, Mighty Mango, and Blue Monster.  Plaintiff has also purchased and ingested other Naked Juice flavors on an ad hoc basis throughout the years.  Most recently, on September 19, 2011, Plaintiff purchased Naked Juice beverages Blue Machine and Pomegranate Blueberry from Kroger's grocery store on 1938 W. Gray St., Houston Texas.  Plaintiff's receipt is attached as Exhibit 1.

21.   Plaintiff saw Defendants' representations that these products were "100% JUICE," "100% FRUIT" "ALL NATURAL" and "non-GMO" on the front of every package she purchased and ingested, and saw these misrepresentations each time she purchased and/or ingested the product. Relying on Defendants' misrepresentations and omissions of material facts, Plaintiff reasonably believed the products she purchased and ingested were all natural non-GMO 100% juice, and these representations were one of the reasons for Plaintiff's purchase.  Plaintiff was deceived because the products were not 100% juice, as Defendants claimed, some of the ingredients came

4

from genetically modified organisms, and not all ingredients in these products were "all natural," including the synthetic substances listed below.

22.    Defendant Naked Juice is a corporation with its principal place of business located at 1333 S. Mayflower Ave., Monrovia, CA 91016. Founded in 1983, Naked Juice distributed its juices out of a backpack to beach-goers in Santa Monica Beach.  By 2007, Naked Juice had sales of over $150 million and produced and shipped 6 million bottles every month.  In January 2007, PepsiCo acquired Naked Juice and markedly grew its sales.  Today, Naked Juice's beverages are distributed nationwide in supermarkets, grocery stores, convenience stores, online retailers, and other venues.

23.    Defendant PepsiCo is the world's second largest food and beverage business.  It has annual revenue of approximately $60 billion, 51% of which is attributable to its sale of beverages. PepsiCo's corporate headquarters are located at 700 Anderson Hill Rd., Purchase, NY 10577. PepsiCo, directly and through its agents, has substantial contacts with and receives benefits and income from and through the State of California.  In 2007, PepsiCo purchased Naked Juice and controls it as a wholly-owned subsidiary.  Through its PepsiCo Americas Beverages division, PepsiCo (independently or through contract manufacturers) makes, markets, and sells Naked Juice beverages.

24.    Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as DOES 1 through 100, and therefore sue these Defendants by fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities of these fictitiously-named Defendants when they are ascertained. Plaintiff is informed and believes and based thereon alleges that DOES 1 through 100 do business in the Central District of California.  Plaintiff is informed and believes and based thereon alleges that at all relevant times each of DOES 1 through 100 is the supplier, manufacturer, examiner, certifier, formulator, engineer, or reseller of the synthetic substances or "natural flavors," or the agent, servant, partner, joint-venturer, co-venturer, principal, director, officer, manager, employee, affiliate, assignee, successor-in-interest, alter-ego, shareholder, or representative of PepsiCo and/or Naked Juice, and was acting in such

capacity in doing the things herein complained of and alleged.

**DEFENDANTS ACTIVELY POSITION NAKED JUICE AS AN ENVIRONMENTALLY AND SOCIALLY CONSCIOUS ALL-NATURAL, NON-GMO, 100% JUICE BRAND**

25.    American consumers increasingly and consciously seek out "all natural" ingredients in their beverages.  Once a specialized market appealing only to particular consumers, by 2011, functional and natural ready-to-drink beverage products became a $23 billion market.

26.    Consumers value "all natural" beverage ingredients for a myriad of reasons, including perceived benefits of avoiding disease, attaining health and wellness, helping the environment, assisting local farmers, assisting factory workers who would otherwise be exposed to synthetic and hazardous substances, and financially supporting the companies that share these values.

27.    Hoping to attract this growing market, Defendants label and advertise their products as being "non-GMO," "ALL NATURAL," "100% JUICE," "100% FRUIT," containing "only the freshest, purest stuff in the world" and using "the best bare-naked fruits."

28.    Defendants portray Naked Juice as providing more than just "all natural" juices, but "bare naked fruit." As Adam Carr, Naked Juice's former general manager, puts it: "We are all about 100 percent juice and using the best bare naked fruit in all of our products."

29.    Defendants' labeling is part of their overall strategy to capture the rapidly expanding natural-foods market. In fact, PepsiCo lists as one of its "imperatives" its need to "build and expand our nutrition business to rapidly grow our Good-for-You portfolio of products." 2010 PepsiCo Annual Report at 14.

30.    Defendants carefully cultivated Naked Juice's public image as a healthy, eco-friendly, worker-friendly brand – the kind of company whose label claims should be truthful.

31.    Defendants flaunt Naked Juice's ecological and environmental programs to further its image as an all-natural "naked fruit" company that consumers can trust.  Defendants openly admit their hope that consumers will perceive these programs as evidence that its representations of "ALL NATURAL" and "100% JUICE" should be trusted:

> Naked® Juice: As Good for the
> Environment as It Is for You!

Naked® Juice, the super-premium juice maker known for using only the best bare-naked fruits and vegetables, extends its pursuit of quality beyond just the ingredients list through their significant sustainability initiatives and developments. Partnerships with non-profit organizations, sponsorship of environmental sustainability programs and recycled packaging developments are just a few of the ways that Naked Juice demonstrates its commitment to quality and sustainability in everything they do.

Naked Juice Website at http://www.nakedjuice.com/fresh-news/all/story/nj-as-good-for-the-environment-as-it-is-for-you, as of 9/20/11.

32.   Defendants broadcast Naked Juice's association with a myriad of environmentally-friendly programs, including its relationship with Rainforest Alliance for banana procurement; ReNEWabottle, a 100% recycled and 100% recyclable bottle; recycling organizations such as RecycleBank and Keep America Beautiful; and its new manufacturing facility which was awarded LEED (Leadership in Energy and Environmental Design) certification.

33.   Furthermore, the package of every bottle of Naked Juice extols the virtues of all-natural eating, such as supporting local farmers:

strawberries,
raspberries and
blackberries all together
in one smoothie? whoa.
it's like a tiny farmers
market in my hand.

Package Images of Naked Juice, attached as Ex. 2.

34.   In an October 1, 2007 article in Beverage Industry, the former General Manager of Naked Juice, Adam Carr, explained how and why a consumer purchases a Naked Juice product. Watching a consumer at the grocery store:

they take a bottle of Naked Juice off the shelf and start reading the packaging. On front of the bottle, in addition to seeing the name of the product, they see the family name, the "100 percent juice smoothie" and "No added sugar" tags, and Naked Juice's Pound Promise of "a pound of fruit in every bottle."[1] . . . Then, consumers can rotate the bottle around and see the list of fruits that are inside and see the functional benefits a product boasts.

35.   The side label operates as an alternate ingredient list.  It is several times larger than the

_____
[1] Naked Juice now is sold in 15.2 fl. oz. containers – less than what a "pound of fruit" implies.

7

actual ingredient list.  It is the list that Defendants intend consumers read and rely upon.

36.    For example, on the Blue Machine flavor, the front describes the "naked" product as "ALL NATURAL FRUIT + BOOSTS," and the side of the package shows that the consumer is getting 27 blueberries, 3 blackberries, 3 ¼ apples, and 1 banana, and lists the corresponding nutritional benefit.

37.    In contrast to this easy-to-read "alternate ingredient list," the actual ingredient list is in suspiciously small font:



38.    Defendants know that consumers believe the representations on the packaging.  In an October 1, 2010 article in AdWeek, Brad Armistead, marketing director for Naked Juice, also described the alternate ingredient list:  "We list out what you get in that bottle and our consumers have come to trust what we put inside."

8

## DEFINITION OF "ALL-NATURAL"

39.   Representing that a beverage product or ingredient is "all natural" is a statement of fact, and these terms have been defined by the federal governmental agencies that regulate food companies such as Defendants.

40.   The FDA has defined the outer boundaries of the use of the term "natural."  According to the FDA, at the very least, a product is not natural if it contains synthetic ingredients.  FDA Consumer Health Information, Food Label Helps Consumers Make Healthier Choices, available at www.fda.gov/downloads/ForConsumers/ConsumerUpdates/UCM199361.pdf.

41.   According to federal regulations, an ingredient is synthetic if it is:

> [a] substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes."

7 C.F.R. § 205.2.

42.   Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defines a "natural" product as a product that does not contain any artificial or synthetic ingredient and does not contain any ingredient that is more than "minimally processed:"

> Minimal processing may include: (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting; or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.
>
> Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing. . . .

USDA FSIS, Food Standards and Labeling Policy Book, available at www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf

43.   Defendants have not disclaimed these federal definitions of "natural."  In fact, Defendants add, on every package, that it uses "only the **freshest, purest** stuff  in the world and leave[s] out everything else."  Ex. 2 (emphasis in original).

44.     A reasonable consumer's understanding of the term "natural" and "100% Juice" comports with these federal definitions and Defendants' further explanation of its ingredients on its packages.

45.     A reasonable consumer would also expect that Defendants' products are what Defendants identify them to be on the label, i.e., that they are 100% all-natural juice using fresh ingredients, containing natural vitamins, with no preservatives, and contain no GMO ingredients.

**FALSE REPRESENTATIONS ON EVERY PACKAGE OF NAKED JUICE**

46.     On every package of Naked Juice, Defendants promise:

The Naked Truth:
We use only the **freshest, purest** stuff  in
the world and leave out everything else.
• no added sugar    •    no preservatives
•     non-GMO**   •   gluten free   •   vegan



Ex. 2.   On its Protein Zone drinks, Defendants make the same "Naked Truth" representation, omitting only its representation of vegan ingredients.  Id.

47.     Regarding non-GMOs (genetically modified organisms), Defendants know that consumers increasingly desire non-GMO foods, and they know that consumers will pay more for non-GMO foods.

48.     On every package of Naked Juice, Defendants promise that they use non-GMO ingredients and add: "**While many ingredients do not exist in bioengineered varieties, Naked Juice does not use ingredients that were produced using biotechnology as a matter of principle."

10



**PERISHABLE KEEP REFRIGERATED**

**\*\*While many ingredients do not exist in bioengineered varieties, Naked Juice does not use ingredients that were produced using biotechnology as a matter of principle.**

PLEASE RECYCLE

Id.

49.    Defendants make false, misleading, and deceptive representations that the below "Falsely Labeled Naked Smoothie Products" are "all natural" and "100% juice" by prominently labeling the beverage as "ALL NATURAL FRUIT + BOOSTS" and  "100% JUICE" (emphasis in the original), including by way of example and without limitation:

        Naked Red Machine
        Naked Green Machine
        Naked Power-C Machine
        Naked Acai Machine
        Naked Blue Machine
        Naked Gold Machine
        Naked Mango Veggie
        Naked Berry Veggie

Id.

50.    Defendants make false, misleading, and deceptive representations that the below "Falsely Labeled Naked Fruit Products" are "all natural fruit" and contain "100% Juice" by prominently labeling the beverage as "ALL NATURAL FRUIT" and "100% JUICE" (emphasis in the original), including by way of example and without limitation: Naked Mighty Mango.  Id.

51.    Defendants make false, misleading, and deceptive representations that the below "Falsely Labeled Naked Juice Products" are "all natural" and contain "100% Juice" by prominently labeling the beverage as "ALL NATURAL" and "100% JUICE" (emphasis in the original), including by way of example and without limitation: Naked Pomegranate Acai and Naked Berry Blast.  Id.

52.    Defendants make false, misleading, and deceptive representations that the below "Falsely Labeled Naked Health Products" are "100% Juice" by prominently labeling the beverage as

11

"100% JUICE" (emphasis in the original), including by way of example and without limitation: Naked Probiotic Tropical Mango and Naked Probiotic Very Berry.

53.    Defendants make false, misleading, and deceptive representations that the below "Falsely Labeled Naked Protein Zone Products" are "a natural" by prominently labeling the beverage as "ALL NATURAL FRUIT + BOOSTS" both on the front and the back of the product, including by way of example and without limitation:

> Naked Protein Zone Double Berry
> Naked Protein Zone
> Naked Protein Zone Mango

54.    The packages of these products (collectively, "Falsely Labeled Products") are attached as Exhibit 2.

55.    Defendants have discontinued offering some of the Falsely Labeled Products, have altered the packaging, altered the ingredients, or have selectively marketed the products.  Defendants also regularly introduce new products that are a falsely labeled as "100% Juice," "All Natural" or other similar claims.  The identity of these additional products will be ascertained through discovery and are included in the list of Falsely Labeled Products.

56.    Further inducing consumers to rely on the deceptive representations that these products are "100% Juice," Defendants did not label some Naked Juices as "100% Juice," leading consumers to believe that Defendants carefully studied each of the products' ingredients to ensure that the "100% Juice" claim is made only on those products that are truly 100% Juice.

**LOCATION OF THE MISREPRESENTATIONS**

57.    Defendants make the above false, deceptive, and misleading misrepresentations and omissions on the front package of each of the Falsely Labeled Products.  Ex. 2.

58.    The misrepresentations and omissions were uniform and have actually been communicated to Plaintiff and to each member of the Class at every point of purchase and consumption.

**NAKED JUICE CONTAINS GENETICALLY MODIFIED INGREDIENTS**

59.    Contrary to using "only the freshest, purest stuff in the world" that are non-GMO, Defendants use GMO ingredients in its products.

60.    Defendants know that Naked Juice products contain genetically modified organisms (GMOs) and genetically engineered ("GE") products, or have so recklessly avoided the truth such that knowledge can be imputed.

61.    Almost all soy products are now genetically modified.

62.    Defendants know that soy products are added to The Naked Juice Protein beverages.

63.    Defendants know that the soy lecithin and soy protein isolate ingredients used in the Naked Juices utilize GMO ingredients by design or by contamination.

64.    In 2008 and in 2009, PepsiCo shareholders asked PepsiCo to create an independent committee of the Board to review PepsiCo policies and procedures for monitoring genetically engineered products, to report the potential of contamination by genetically engineered products (such as when genetically engineered seeds are blown by wind into neighboring crops), and to report on a contingency plan for removing genetically engineered ingredients from Defendants' products should circumstances so require.   See PepsiCo 2009 Notice of Annual Meeting of Shareholders at p. 61 (available at http://www.pepsico.com/Annual-Reports/2008/downloads/files/PepsiCo_2009-Proxy-Statement.pdf) and PepsiCo 2008 Notice of Annual Meeting of Shareholders at p. 45 (available at http://www.pepsico.com/Annual-Reports/2007/pdf/Pepsi_Proxy08.pdf)

65.    PepsiCo declined:

> We believe that genetically engineered products can play a role in generating positive economic, social and environmental contributions . . .
>
> As a result, along with most other food companies in the United States, PepsiCo has products that may contain genetically engineered ingredients. PepsiCo's use of these genetically engineered ingredients is fully compliant with FDA requirements . . .
>
> As PepsiCo maintains its own high safety standards and relies on government agencies worldwide to effectively regulate food standards, we do not believe the report requested by the proponents would serve any significant purpose to promote safety.

PepsiCo 2009 Notice of Annual Meeting of Shareholders at p. 62.

66.    PepsiCo repeatedly stated that it would not take it upon itself to ensure that its products did not contain GMOs – despite its labeling to the contrary, but would rely upon federal agencies to

13

do the job for them:

> PepsiCo, however, believes that the U.S. Food and Drug Administration, and other national and international regulatory authorities who are charged with protecting the health and safety of the public and the environment, are the proper entities, rather than a manufacturer like PepsiCo, to evaluate and make judgments about the labeling and sale of genetically engineered products. . . .

PepsiCo 2008 Sustainability Report at 23, available at

www.pepsico.com/Download/PepsiCo_2008_Sustainability_Report.pdf

67.    The FDA has expressly stated otherwise: "Ultimately, it is the food producer who is responsible for assuring safety." FDA, "Statement of Policy: Foods Derived from New Plant Varieties", (GMO Policy), Federal Register, Vol. 57, No. 104 (1992), p. 22991, available at http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/Biotechnology/ucm096095.htm.

68.    Moreover, soy lecithin and soy protein isolate require such extensive processing that they are more akin to a food lab science experiment than the "freshest, purest stuff in the world."

69.    To manufacture soy lecithin and soy protein isolate, soybeans must be processed to separate its oils from its proteins.  According to the United States Department of Agriculture (USDA), soybeans are processed with hexane, a byproduct of gasoline refining.

70.    Hexane is a neurotoxin and a hazardous air pollutant. See http://www.cdc.gov/niosh/topics/organsolv/ and http://www.epa.gov/ttn/atw/hlthef/hexane.html. It is also a synthetic substance.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  Occupational exposure has been linked to neurological disorders including polyneuropathy, optic nerve atrophy, narcosis, and may contribute to the development of Leber hereditary optic neuropathy, a disease that causes loss of vision.

71.    These soy products are all heavily processed to remove the natural "bean" flavor so that the finished "soy" product no longer tastes like soy.  Soy protein products are further refined through additionally rigorous processes, using chemical additives, acid washes, and alkaline solutions.

72.    Soy lecithin, a lecithin derived from soy, is isolated as a gum following hydration of

hexane-extracted soybeans.  Lecithin can be bleached by hydrogen peroxide and benzoyl peroxide and dried by heating.  Lecithin is used to help reduce the viscosity of foods, influencing the dispersion of fat molecules and ultimately the "mouth-feel" of the product.

73.   Soy protein isolate is so heavily processed that a Technical Advisory Panel addressing the requirements of the Organic Foods Production Act of 1990 concluded that it is a synthetic substance. The spray drying process forms nitrites, potent carcinogens.  The alkaline processing forms lysinoalanine, a toxin.  Database of Select Committee on GRAS Substances (SCOGS) Reviews, Soy Protein Isolate.

## NAKED JUICE CONTAINS SYNTHETIC AND OTHER NON-JUICE INGREDIENTS

74.   Contrary to Defendants' false representations that its Falsely Labeled Products contain only the "freshest, purest stuff in the world," are "100% JUICE," "ALL NATURAL," "ALL NATURAL FRUIT," "ALL NATURAL FRUIT  + BOOSTS," each Falsely Labeled Product contained one or more of the below synthetic ingredients. The ingredient labels of Falsely Labeled Products are included in Exhibit 2, and an ingredient list from www.pepsicobeveragefacts.com is attached as Exhibit 3.

75.   Defendants falsely and misleadingly describe synthetic compounds included in the Falsely Labeled Products to be the same as a vitamin that exists naturally.  For example, Defendants list as ingredients:

> VITAMIN E (AS ACETATE), NIACINAMIDE (VITAMIN B3), D-CALCIUM PANTOTHENATE (VITAMIN B5), PYRIDOXINE HYDROCHLORIDE (VITAMIN B6), CYANOCOBALAMIN (B12) . . .

Ex. 3 (Ingredients in Blue Machine).  *See also* id., Ingredients in Berry Vegetable Machine (listing "D-ALPHA TOCOPHEROL ACETATE (VITAMIN E) . . . . BETA CAROTENE (VITAMIN A) . . .").

76.   Defendants' ingredient list is false, misleading, and deceptive.

77.   Defendants misleadingly claim that the synthetic substance is the same as the vitamin claimed, when in fact the substance is altogether a different compound.

15

78.   Defendants misleadingly claim that the synthetic substance is "ALL NATURAL," an all natural "ALL NATURAL . . . BOOST," when the substance in fact is not "natural" but synthetic.

79.   Defendants misleadingly claim that the synthetic substance is contained naturally in "100% JUICE" or "100% FRUIT," when in fact it does not exist naturally in juice, and it does not exist naturally in fruit.

80.    Defendants deceptively conceal that the synthetic substance does not exist naturally in fruit and the fruit juice.

81.   Defendants deceptively conceal that they did not extract the added "boosts" from a natural source, such as a fruit or a vegetable, but instead used a synthetic substance.

82.   Defendants misleadingly claim that the vitamin that is naturally found in juice (e.g., natural vitamin E or natural vitamin A) is contained in the beverage as an added, all-natural "boost" when it is not.

83.   Defendants know that consumers believe that vitamins have better absorption rates, and/or are otherwise superior when they are consumed from their natural food sources rather than as synthetic compounds.

84.   Defendants know that consumers desire all natural beverages for other reasons, including environmental and political reasons.  For example, Defendants know that consumers desire all-natural beverages for environmental reasons, e.g., to help reduce the environmental waste and pollution created through the manufacture of synthetic chemicals, which often employs environmentally hazardous substances or results in hazardous byproducts.  Defendants know that consumers desire all-natural beverages also for political reasons, allowing them to financially support those companies that share these values.

85.   ***Niacinamide*** is the chemical 3-pyridinecarboxylic acid amide (nicotinamide)."  21 C.F.R. § 184.1535.  It is federally recognized as a synthetic substance.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  According to the National Library of Medicine's Hazardous Substances Data Bank ("HSDB"), it is usually prepared by esterifying nicotinic acid with methanol, followed by ammonolysis.  It is alternately

prepared by passing ammonia gas (a hazardous substance) into molten nicotinic acid or from

partial hydrolysis of 3-cyanopyridine.

86.    Niacinamide is a synthetic variation of natural vitamin B3 (niacin). The two are chemically

and molecularly distinct:  Vitamin B3 (niacin) ($C_6H_5NO_2$) has the structure:

While niacinamide ($C_6H_6N_2O$) is

87.    By FDA regulation, ***calcium pantothenate*** is synthetically prepared from

isobutyraldehyde, a synthetic flavoring substance and toxic chemical, 21 C.F.R. § 184.1212; 40

C.F.R. § 372.65, and formaldehyde, a hazardous substance, 40 C.F.R. § 116.4, via 1,1-dimethyl-

2-hydroxy-propionaldehyde and pantolactone." 21 C.F.R. § 184.1212.

88.    Calcium pantothenate is a synthetic approximation of vitamin B5.  Vitamin B5 ($C_9H_{17}NO_5$)

has the molecular structure:

17

Calcium pantothenate ($C_{18}H_{32}CaN_2O_{10}$) however, has the molecular structure:



89.   Defendants add **D-alpha tocopherol acetate** to their Naked Juices, a chemical preservative and synthetic substance.  7 C.F.R. § 205.605(b) (synthetic); 21 C.F.R. § 182.3890 (chemical preservatives). It is produced by molecular distillation, solvent extraction, or absorption chromatography.  D-alpha tocopherol acetate ($C_{31}H_{52}O_3$):



is chemically and molecularly distinct from Vitamin E ($C_{29}H_{50}O_2$):



90.   **Cyanocobalamin** is a synthetic compound.  U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  It must be produced commercially from cultures of Streptomyces griseus to be safe as a food additive.  21 C.F.R. § 184.1945.   Cyanocobalamin ($C_{63}H_{88}CoN_{14}O_{14}P$) is chemically and molecularly distinct from natural vitamin B12 (cobalamin, $C_{62}H_{88}CoN_{13}O_{14}P$), which is found naturally in animal foods such as fish, liver, poultry, eggs, and milk products. Cyanocobalamin does not give the human

18

1   body the full range of vitamin B12 activity found in natural vitamin B12. Unlike natural vitamin

2   B12, the body converts cyanocobalamin to methylcobalamin and adenosylcobalamin, leaving the

3   body to enzymatically remove the resulting cyanide.

4   91.   ***Pyridoxine hydrochloride*** is also a synthetic compound.  U.S. International Trade

5   Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  By federal

6   regulation, it is prepared by chemical synthesis. 21 C.F.R. § 184.1676.  According to HSDB, it

7   is synthesized by the condensation of  cyanoacetamide with ethoxyacetylacetone in the presence

8   of piperidine, 2-butanone-1,4-diol & alpha-methyliminopropionitrile and/or other substances.

9   U.S. Patent 2,680,743; GRAS Status of Pyridoxine and Pyridoxine Hydrochloride, 47 F.R.

10   44572-03.  Alternatively, it is synthesized from ethyl pyruvate, ethyl glycinate, & 1,4-diethoxy-

11   2-butanone, and other substances.  U.S. Patent 2,904,551.

12   92.   Pyridoxine hydrochloride is a synthetic variation of vitamin B6. It is chemically and

13   molecularly distinct.  Natural B6 complex (pyridoxine) ($C_8H_{11}NO_3$) is a different substance than

14   pyridoxine hydrochloride ($C_8H_{12}ClNO_3$).

15   93.   Defendants falsely assert in the ingredient list that ***beta-carotene*** is vitamin A.  It is not

16   Vitamin A (retinol) is $C_{20}H_{30}O$:



23   Beta-carotene, by contrast, is $C_{40}H_{56}$:



19

94.   *Choline bitartrate,* another synthetic approximation of vitamin B, is federally listed as a synthetic substance. U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995).  According to the National Library of Medicine's Hazardous Substances Data Bank ("HSDB"), choline bitartrate is produced by the reaction of trimethylamine with ethylene oxide followed by treatment with tartaric acid.  Trimethylamine and tartaric acid are both hazardous substances. 40 C.F.R. § 116.4.

95.   On the side of their bottles, Defendants assert that the juices that list choline bitartrate as an ingredient contain choline.  This is false and misleading.  Choline bitartrate is not the same substance as choline.  Choline bitartrate ($C_9H_{19}NO_7$) is a synthetic variation of choline ($C_5H_{14}NO$), a nutrient naturally found in grains, nuts, and beans.  Choline bitartrate is a salt of choline.

96.   *Ascorbic acid* is a federally-declared synthetic substance and a chemical preservative. 7 C.F.R. § 205.605(b) (synthetic); U.S. International Trade Commission, Synthetic Organic Chemical Index, USTIC Pub. 2933 (Nov. 1995) (synthetic); 21 C.F.R. § 182.3013 (chemical preservative).  Ascorbic acid is synthetically produced by reducing glucose to sorbitol by hydrogenation over a nickel catalyst.  The sorbitol is partially oxidized by protecting four of the hydroxyl groups with acetone (synthetic) and sulfuric acid (synthetic), and then chemical oxidization to carboxylic acid.  Acid hydrolysis finally yields the ascorbic acid.

97.   Some studies suggest that ascorbic acid does not have the same positive health benefits as natural vitamin C. According to the National Institute of Health, Office of Dietary Supplements, "[e]vidence from most randomized clinical trials suggests that vitamin C supplementation, usually in combination with other micronutrients, does not affect cancer risk."  However, studies of consumption of vitamin C from food was associated with a 63% lower risk of breast cancer among premenopausal women with a family history of breast cancer.

98.   *Zinc methionine* sulfate can be safely used in food or beverage products when produced by the reaction between equimolar amounts of zinc sulfate (a hazardous substance, 40 C.F.R. § 116.4) and DL-methionine (a synthetic substance, 7 C.F.R. § 205.603).  21 C.F.R. § 172.399.

20

99.   *Zinc oxide* is a synthetic compound.  7 C.F.R. § 205.601(j)(6)(ii).   It is used as a color additive in drugs and cosmetics.  See 21 C.F.R. §§ 73.1991, 73.2991.  Zinc oxide used in commercial purposes is usually produced by chemical synthesis or by vaporizing metallic zinc at extreme high heat.

100.   Defendants also add synthetic fiber to their Naked Juice Beverages, misleadingly suggesting to consumers that the fiber content in the beverages is from natural fruits and juices, when in fact, they are not.

101.   *Fibersol®-2* is a proprietary formulation of digestion-resistant maltodextrin that was developed by Japan's Matsutani Chemical Industry Co. Ltd. The FDA classifies digestion-resistant maltodextrins as synthetic fibers. Federal Register Advance Notice of Proposed Rulemaking (Food Labeling) 72 FR 62149, Nov. 2, 2007.  Fibersol®-2 has been produced by Archer Daniels Midland Co. since 1999.  Fibersol®-2 production requires hydrochloric acid (a hazardous substance, 40 C.F.R. § 116.4). Dec. 7, 1990 Letter from Robert Leo Martin, Dept. of Health & Human Serv., Direct Additives Branch of the Division of Food and Color Additives. Fibersol®-2 is produced by "a proprietary process to purposefully rearrange corn starch molecules to convert a portion of normal alpha -1,4- glucose linkages to random 1,2-, 1,3-, and 1,4- alpha and beta linkages.  The human digestive system effectively digests only alpha -1,4- linkage. Therefore, other linkages created are resistant to digestion, not absorbed in the small intestine and passed on to the large intestine. Fibersol®-2 is partially fermented in the large intestine with the fractions that aren't utilized excreted."  Matsutani Chemical Industry Co. on the Bioavailability of Fibersol®-2, available at www.matsutaniamerica.com/fs2/bioavailability.php

102.   *Fructooligosaccharides* are synthetic fibers. Federal Register Advance Notice of Proposed Rulemaking (Food Labeling) 72 FR 62149, Nov. 2, 2007.  They are also sweeteners and their inclusion renders false Defendants' representations that their Naked Juice products contain no added sugars.

103.   *Inulin,* known as "invisible fiber," is added to foods and beverages to artificially increase fiber content without the typical fiber mouth-feel.  According to the USDA, inulin is extracted

from the root of the chicory plant (Cichorium intybus) by a hot water diffusion process. Subsequently, the extracted inulin is partially enzymatically hydrolyzed to yield oligofructose enriched inulin. The hydrolyzate is dried to a powder for application in foods. Enzyme hydrolyzation reduces the chemical chain length of the oligosaccharide polymer resulting in varying functional properties between inulin and the oligofructose enriched form. The shorter polymer chain length increases polymer solubility and facilitates product texture and consistency. *See* 72 Fed. Reg. 27259-62, available at http://tinyurl.com/3cj9tqp

104.  Not only are these ingredients not juice, but they are also synthetic and/or highly processed, as described above, rendering them not "natural" by consumer's reasonable expectations and by federal definition.  Some additional ingredients, such as biotin, may be synthetic depending upon Defendants' method of production.

105.  Defendants include other non-juice ingredients in its so-called "100% Juice" products, including: food coloring, bacteria (bifidobacterium), algae (including blue green algae and chlorella), whey protein concentrate, fruit and vegetable powders, and fruit and vegetable extracts.

## THE REPRESENTATIONS ARE FALSE, DECEPTIVE, AND MISLEADING

106.  By adding ingredients that are not juice, not fruit, are not natural, are not the vitamins claimed, and by including genetically modified organisms (GMOs), Defendants' representations are false, deceptive, and misleading.

107.  Defendants' conduct deceived and/or was likely to deceive the public.  Consumers were deceived into believing that the listed synthetic substances were natural substances that were naturally found in 100% juice.  However, Defendants were not simply listing the enzymes, the natural vitamins, or the other components of 100% natural juice.  Instead, the synthetic substances were added to the foods, are foreign substances to these foods, and are not reasonably expected by consumers to be added to the foods.

108.  Defendants highlight Naked Juice's vitamin content on the front of the bottle labels.  For example, Defendants emphasize the vitamin A, C, and E content of Gold Machine, which are

added as the synthetic substances ascorbic acid, beta-carotene, and D-alpha tocopherol acetate.

109.  Defendants again highlight Naked Juice's vitamin content on the side of the bottle label, listing the fruits and vegetables in the beverage next to the vitamin content, fraudulently indicating that the vitamins came from these fruits and vegetables.



Ex. 2 (Blue Machine)

110.  Defendants' labeling fraudulently conceals that the beverage's ingredients are not even molecularly the same as these vitamins, and fraudulently concealing that many of the vitamins are not from the "bare-naked fruits" or "100% juice," but synthetic variations of these vitamins, which lack the many benefits of natural vitamins.

111.  When Defendants tout the beverage's fiber content while representing it to be "bake naked fruit" and "100% juice," Defendants additionally deceive and mislead consumers to believe that the fiber content comes from natural fruit fibers.  In fact, many of the beverages' fiber content is artificially inflated by Defendants' addition of synthetic fibers such as Fibersol®-2, inulin, and fructooligosaccharides. See, e.g., Exs. 2, 3 (Blue Machine).

112.  Consumers would not know the true nature of the ingredients merely by reading the ingredient label.  Its discovery requires investigation beyond the grocery store and a knowledge of food chemistry beyond that of the average reasonable consumer.  For example, consumers

were deceived into believing that fructooligosaccharides were natural sugars that are present in 100% pure fruit, and they would not know its true nature without analyzing federal regulations and studying food chemistry.

**DEFENDANTS CONCEAL INGREDIENTS IN ITS NAKED JUICES**

113. Defendants have concealed the nature, identity, source, and/or method of preparation of additional ingredients, which may also be highly processed and/or synthetic substances. For example, Defendants' whey ingredients may include hydrogen peroxide and free D-glutamic acid.

114. Defendants have concealed the true nature of some of its products by misleadingly identifying it. For example, Defendants conceal that its synthetic substances are not chemically the same as the vitamins they are claimed to be. As another example, Defendants list zinc methionine as an ingredient in some of its so-called "100% Juices," rather than zinc methionine sulfate – concealing the fact that it is a sulfate.

115. Defendants conceal the nature, identity, source, and/or method of preparation of the "natural flavors" that are present in almost all of its products, including the Falsely Labeled Products and in additional products such as Coconut Water – Lychee, Coconut Water – Mango Peach, Coconut Water – Pineapple, Orange Mango, Pomegranate Blueberry, Reduced Calorie Lychee, Reduced Calorie Peach Guava, Reduced Calorie Tropical, and Strawberry Banana. The possible carcinogenic, toxic, and environmental effects of these "natural flavors" are still unknown to consumers today.

116. Consumers have requested information about the nature, identity source, and/or method of preparation of these "natural flavors." Defendants have refused to disclose this information.

117. Defendants also have refused to disclose the fact that "natural flavors" used in juices can include compounds derived from "meat, seafood, poultry, eggs, dairy products, or fermentation products thereof . . ." 21 C.F.R. § 101.22(a)(3).

118. "Natural flavors" need not be derived from these substances in a way that maintains its integrity as the "freshest, purest stuff in the world." It can be the "essential oil, oleoresin,

essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis . . ." 21 C.F.R. § 101.22(a)(3).  It can also be produced using synthetic chemicals, hazardous or toxic materials, or other substances.

119.  Defendants deceptively and misleadingly conceal other material facts about the Falsely Labeled Products, including:

a)   The true nature of the Falsely Labeled Product's ingredients;

b)   That the Falsely Labeled Products contain artificial substances; synthetic substances; GMOs, or are otherwise not juice;

c)   That the Falsely Labeled Products do not conform to "The Naked Truth" as posted by Defendants on each and every bottle of Naked Juice;

d)   That the Falsely Labeled Products are not what a reasonable consumer would consider to be "natural," or "juice" or non-GMO;

e)   That vitamins contained in the Falsely Labeled Products are synthetic and are not naturally derived;

f)   That vitamins contained in the Falsely Labeled Products are qualitatively different from vitamins that exist naturally in 100% juice or are naturally derived;

g)   That the fiber contained in the Falsely Labeled Products are synthetic and do not come from natural fruit or juice;

h)   That the fiber contained in the Falsely Labeled Products are qualitatively different from fiber that exists naturally in fruit, in juice, or are naturally derived;

i)   That ingredients contained in Falsely Labeled Products are added to imitate characteristics of a natural product, such as vitamin content, "freshness," viscosity, taste, texture, mouthfeel, etc.;

j)   That ingredients contained in Falsely Labeled Products are added to give an unnaturally long shelf-life and shelf stability to the product;

**DEFENDANTS KNEW IT WAS FALSE**

120.  Defendants knew what representations they made regarding the Falsely Labeled Products, as all representations appear on the products' packages.

25

121.  Defendants also knew what ingredients were added to each product, as (presumably) all product ingredients are listed on the product packages and are further disseminated on their websites.

122.  Defendants are governed by and knew the federal regulations that control the labeling of the Falsely Labeled Products, and thus were aware that many of the Naked Juice ingredients have been federally declared to be synthetic substances and/or require extensive processing to be safely used as a beverage ingredient.  Defendants have retained expert nutritionists, food chemists, and other scientists, and have spent much time and money in developing their own food technologies, such that they were aware that all these synthetic substances are not natural by their own "Naked Truth" and by federal regulation.

123.  Defendants thus knew all the facts demonstrating that its Falsely Labeled Products contain synthetic substances and that these products are falsely labeled.

**DEFENDANTS INTENDED TO DECEIVE CONSUMERS**

124.  Defendants' deception is knowing and willful.  The truth of their misrepresentations are known to people in Defendants' industry, and certainly known by PepsiCo's world-class research and development department, and by Naked Juice's Science Advisory Board.

125.  Lest any consumer become the wiser, Defendants continually encourage consumers' false expectation that Naked Juice is "naked fruit" and 100% juice, as Defendants represent on every package.  One public relations expert representing Naked Juice put it this way: "our products are made from 100 percent fruit and vegetable juices, with the only non-juice ingredients coming in the form of whey and soy for our protein smoothies. There is no added sugar, no preservatives and nothing artificial in Naked Juice–ever."

126.  Defendants repeat this mantra at every opportunity.  It is front-and-center on their product packaging, internet and print marketing, video, and social media marketing.  For example, its Twitter page describes Naked Juice: "All natural 100% juices and juice smoothies, made from the best bare-naked fruits. No added sugar and no preservatives – ever! http://nakedjuice.com"

Naked Juice Twitter website, available at http://twitter.com/#!/Naked_Juice

### DEFENDANTS FRAUDULENTLY CONCEALED THEIR WRONGS, TOLLING THE STATUTE OF LIMITATIONS

127.   Plaintiff, by and through her attorney, discovered Defendants' wrongs in 2011, through investigation of the food production processes of the Naked Juice ingredients, the Naked Juice packages, and Defendants' business practices.  Plaintiff and the members of the Class are not at fault for failing to discover the Defendants' wrongs earlier, and had no actual or presumptive knowledge of facts sufficient to put them on inquiry.

128.   To this day, Defendants have concealed and suppressed the true nature, identity, source, and method of production of the "natural flavors" and other ingredients in the Falsely Labeled Products despite consumers' inquiry attempts.

129.   The production process Defendants use for these ingredients is known only to Defendants, and Defendants have refused to disclose such information to Plaintiff and the Class.  These facts are not ascertainable and are still not known to Plaintiff, the Class, and to the reasonable consumer.  Defendants' continuing concealment tolls the applicable statute of limitations.

130.   In the alternative, Plaintiff alleges that Defendants engaged in the wrongful acts complained of within the applicable four-year statute of limitations, and amends its definition of the Class to include only those consumers who have purchased Falsely Labeled Products within the applicable statute of limitations.

**CONSUMERS REASONABLY RELIED**

131.  Consumers frequently rely on food label representations and information in making purchase decisions.

132.  Each time Plaintiff and the Class members purchased the Falsely Labeled Products, Plaintiff and the Class members saw the product packages and thus also saw the false, misleading, and deceptive representations detailed above, and did not receive disclosure of the facts concealed as detailed above.

133.  Plaintiff and the Class members were among the intended recipients of Defendants' deceptive representations and omissions.

134.  Plaintiff and the Class members reasonably relied to their detriment on Defendants' misleading representations and omissions.

135.  Defendants' false, misleading, and deceptive misrepresentations and omissions deceived and misled, and are likely to continue to deceive and mislead, Plaintiff, Class members, reasonable consumers, and the general public.

136.  Plaintiff and Class members were further deceived and misled by Defendants' failure to disclose the above-listed material facts.  Defendants' misleading affirmative statements further obscured what Defendants failed to disclose.  Thus, reliance upon Defendants' misleading and deceptive representations and omissions may be presumed.

137.  Defendants made the deceptive representations and omissions on the Falsely Labeled Product labels with the intent to induce Plaintiff's and the Class members' purchase of the Falsely Labeled Products, Plaintiff's and the Class members' reliance upon such representations and omissions may be presumed.

138.  Defendants' deceptive representations and omissions are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions, Plaintiff's and the Class members' reliance upon such representations and omissions may be presumed as a matter of law.  The materiality of those representations and omissions also establishes causation between Defendants' conduct and the

28

injuries sustained by Plaintiff and the Plaintiff Class.

### DEFENDANTS INTENDED CONSUMERS RELY

139.  Defendants made the false, deceptive, and misleading representations and omissions, intending Plaintiff and Class members rely upon these representations and omissions in purchasing and ingesting one or more Falsely Labeled Products.

140.  In making the false, misleading, and deceptive representations and omissions, Defendants knew and intended that consumers would pay a premium for "all natural" products, "100% juice" products, and non-GMO products over comparable products that are not "all natural," not "100% juice" or contain GMOs, furthering Defendants' private interest of increasing sales for its products and decreasing the sales of the all-natural products that are truthfully offered by Defendants' competitors.

### DEFENDANTS' WRONGFUL CONDUCT CAUSED PLAINTIFFS' INJURY

141.  As an immediate, direct, and proximate result of Defendants' false, misleading, and deceptive representations and omissions, Defendants injured Plaintiff and Class members in that they:

    a)  paid a sum of money for a product that was not as represented;

    b)  paid a premium price for a product that was not as represented;

    c)  were deprived the benefit of the bargain because the Falsely Labeled Products they purchased were different than what Defendants warranted;

    d)  were deprived the benefit of the bargain because the Falsely Labeled Products they purchased had less value than what was represented by Defendants;

    e)  did not receive a product that measured up to their expectations as created by Defendants;

    f)  ingested a substance that was other than what was represented by Defendants;

    g)  ingested a substance that Plaintiff and the members of the Class did not expect or give informed consent to;

    h)  ingested a product that was artificial, synthetic, not the vitamin claimed, GMO, not juice, or otherwise not natural;

    i)  ingested a product that did not bring the health benefits Defendants promised;

j)  ingested a substance that is or is produced using a substance that is generally harmful to their health, their children's health, or their unborn fetus's health;

k)  ingested a substance that is, contains, or is produced by a known or suspected toxin, carcinogen, hazardous substance, poses health or environmental risks, or otherwise is harmful to the environment and/or the factory workers that produce or process such substances;

l)  ingested a substance that was of a lower quality than what Defendants promised;

m)  were denied the benefit of knowing what they ingested;

n)  were denied the benefit of truthful food labels;

o)  were forced to unwittingly support an industry that contributes to environmental, ecological, or health damage;

p)  were denied the benefit of supporting an industry that sells all-natural foods and contributes to environmental sustainability;

q)  were denied the benefit of the beneficial properties of the all-natural foods promised.

142.  Had Defendants not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class members would not have been injured.  Among other things, they would not have been denied the benefit of the bargain.  They would not have ingested a substance that they did not expect or consent to.  They would not have been forced unwittingly to support an industry that contributes to environmental damage.  They would not have suffered the other injuries listed above.  Accordingly, Plaintiff and the Class members have suffered injury in fact as a result of Defendants' wrongful conduct.

143.  Plaintiff and the Class members all paid money for the Falsely Labeled Products. However, Plaintiff and the Class members did not obtain the full value of the advertised products due to Defendants' misrepresentations and omissions.  Plaintiff and Class members purchased, purchased more of, or paid more for, the Falsely Labeled Products than they would have had they known the truth of the products.  Accordingly, Plaintiff and the Class members have suffered injury in fact and lost money or property as a result of Defendants' wrongful conduct.

30

**DEFENDANTS BENEFITTED FROM THEIR MISLEADING AND
DECEPTIVE REPRESENTATIONS AND OMISSIONS**

144.  As the intended, direct, and proximate result of Defendants' false, misleading, and deceptive representations and omissions, Defendants have been unjustly enriched through more sales of Falsely Labeled Products and higher profits at the expense of Plaintiff and the Class.  As a direct and proximate result of their deception, Defendants also unfairly hold other benefits, including the higher value of an "all natural," "100% juice," and "non-GMO" brand and resulting higher stock value.

145.  PepsiCo has further benefited from their misleading and deceptive representations and omissions through the piggy-back sale of other PepsiCo products. PepsiCo has declared this to be not just a coincidence, but an "imperative" it calls the "Power of One."

146.  The Power of One seeks to convince consumers that when they buy a PepsiCo beverage, such as Naked Juice, they should also reach for a PepsiCo snack, such as Stacy's All-Natural Pita Chips, a brand also owned by PepsiCo. "Studies show that, 85 percent of the time, when a person eats a snack, he or she also reaches for a beverage. No company on earth is better positioned to fulfill both sides of that equation."  2010 PepsiCo Annual Report at 14, available at http://www.pepsico.com/annual10/downloads/PepsiCo_Annual_Report_2010_Full_Annual_Rep ort.pdf

**PEPSICO**

147.  PepsiCo actively and directly made the alleged false, misleading, and deceptive representations and omissions.  PepsiCo also directed Naked Juice's false, misleading, and deceptive representations and omissions.  PepsiCo also disseminated Naked Juice's false, misleading, and deceptive representations and omissions.

148.  Naked Juice's product marketing and packaging are under PepsiCo's direct orders, direction, control, and consent.

149.  Defendant PepsiCo also heavily markets itself as a company committed to "Performance with a Purpose," its corporate strategy aimed at achieving "sustainable growth by investing in a healthier future for people and our planet."  The Performance with a Purpose strategy contains

31

numerous laudatory and ambitious goals – including offering consumers a wider selection of wholesome foods and beverages, improving nutrition education and availability, reducing its negative environmental impact, and creating a company that supports its employees.

150.  One of the major planks of "Performance with a Purpose" is PepsiCo's much-touted goal of "Human Sustainability," which includes a goal of "encourage[ing] people to make informed choices and live healthier."  *See* http://www.pepsico.com/Purpose/Human-Sustainability.html. PepsiCo further promises the public that it "is committed to providing clear and useful nutrition labeling that helps consumers make nutritionally informed choices." http://www.pepsico.com/Purpose/Human-Sustainability/Nutrition-Labeling.html

151.  PepsiCo similarly markets its programs and initiatives to support the environment and local farmers.  PepsiCo boasts that "[t]hese initiatives are simply the right thing to do, and they also demonstrate PepsiCo's interest in the development of the agricultural supply chain in emerging markets."  2010 PepsiCo Annual Report at 4.

152.  PepsiCo is a business, and it adopts these challenges to improve its bottom line. As Indra K. Nooyi, PepsiCo's Chairman and Chief Executive Officer, succinctly puts it, "what is good for society and what is good for our business are the same thing."  2010 PepsiCo Annual Report at 14.

153.  In its quest to capture the highly competitive market desiring all-natural products, 100% juice beverages, and/or non-GMO products, PepsiCo intentionally and artificially enlarged its "Good-For-You" product portfolio by labeling Naked Juice products as "ALL NATURAL," "100% JUICE," and non-GMO when they are not.  PepsiCo actively deceives consumers and conceals from them the information it had promised.

154.  PepsiCo owns and controls the research and development divisions that are responsible for the food ingredients and food science used in the Falsely Labeled Products.

155.  PepsiCo also audits and approves all ingredient suppliers of Naked Juice products.

156.  PepsiCo determines the audit standards and GMO-testing standards for Naked Juice products.

157.  Over the past several years, PepsiCo expanded its research and development capabilities to develop new products, increase the nutrition yield of existing products, and alter product formulations so as to be "all natural."

158.  PepsiCo formed its Global Nutrition Group to help grow its $10 billion Good-For-You product lines to $30 billion by 2020. The group, led by Dr. Mehmood Khan, a former Mayo Clinic endocrinologist, leads PepsiCo and its subsidiaries' innovation in the areas of fruits and vegetables, grains, dairy and functional nutrition.

159.  Through its Global Nutrition Group and its PepsiCo America Beverage business division, PepsiCo centralizes the business decisions and innovations for its "Good-For-You" product line, including Naked Juice products.

**CLASS ACTION ALLEGATIONS**

160.  Plaintiff brings this action on behalf of herself and on behalf of all other Class members defined as all consumers residing in the United States who purchased in the United States Falsely Labeled Products, as defined above.

161.  Excluded from the Class are: (1) Defendants; (2) any entity in which any Defendant has a controlling interest; (3) the legal representatives, officers, directors, assigns, and successors of any Defendant; (4) the Judge to whom this case is assigned and any member of the Judge's immediate family; (5) all consumers, if any, who received a full refund from Defendants for their purchase of Falsely Labeled Products due to the facts alleged herein; and (6) all claims for personal injury, wrongful death, or any incidental damages over and above those sought herein, except as authorized by law.

162.  Plaintiff brings this Class pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

163.  Upon information and belief, there are thousands of Class members who are geographically dispersed throughout the United States.  Individual joinder of all Class members would be impracticable.

164.  Numerous common questions of law or fact exist as to all Class members. These questions

33

COMPLAINT

predominate over the questions affecting only individual class members. These common legal or factual questions include, but are not limited to:

a) Whether Defendants' labeling of the Falsely Labeled Products is false, misleading, or deceptive;

b) Whether one or more of the ingredients used in the Falsely Labeled Products is synthetic, GMO, not natural, or not juice;

c) Whether Defendants failed to disclose material facts regarding the Falsely Labeled Products;

d) Whether Defendants had a duty to Plaintiffs and the Class to disclose the material facts regarding the Falsely Labeled Products;

e) Whether Defendants violated California law, federal law, and/or common law;

f) Whether Defendants knew the true nature of the ingredients in the Falsely Labeled Products;

g) Whether Class members have a right to damages, restitution, or other legal or equitable remedy by virtue of Defendants' violations of law;

h) Whether Class members have the right to declaratory or injunctive relief.

165.  Plaintiff's claims are typical of the claims of the Class because they are based on the same factual, legal, and remedial theories as the claims of the Class.

166.  Plaintiff will fairly and adequately represent and protect the interests of the Class because Plaintiff is similarly situated with, and has suffered similar injuries as, the members of the Class she seeks to represent. She feels that she has been deceived, wishes to obtain redress of the wrong, and wants Defendants stopped from perpetrating similar wrongs on others.  Plaintiff is an adequate representative of the Class also because her interests do not conflict with the interests of the class members she seeks to represent, and she has retained counsel competent and experienced in conducting complex class action litigation who led the investigation uncovering Defendants' wrongs, who have no interests adverse to those of the class, and who can and will vigorously prosecute this litigation.

167.  Certification of the Class under Rule 23(b)(1) is appropriate because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications

34

with respect to individual class members that would establish incompatible standards of conduct for Defendants, whose product sales and product marketing efforts are on a nation-wide scale.

168.  Certification of the Class under Rule 23(b)(2) is also appropriate because Plaintiff seeks injunctive and declaratory relief as detailed below.  Defendants acted in the same manner toward the entire class by marketing, representing, and selling the Falsely Labeled Products through unlawful, deceptive, fraudulent, and otherwise wrongful methods, thereby making appropriate preliminary and final equitable relief with respect to the Class.

169.  Certification of the class under Rule 23(b)(3) is also appropriate because the questions of law and fact common to the Class members predominate over any questions affecting only individual members.  A class action is also superior to other available methods for the fair and efficient adjudication of the controversy, in that:

a)  consumers cannot effectively prosecute separate actions for their individual purchases of the Falsely Labeled Products;

b)  concentration of the litigation concerning this matter in this Court is desirable; and

c)  the class is of a moderate size and the difficulties likely to be encountered in the management of a class action are not great.

170.  A class action is superior to other available means for the fair and efficient adjudication of this dispute:

a)  Common questions of law and fact predominate over any individual questions that may arise.

b)  No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.  The damages suffered by each individual class member likely will be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' conduct. Thus, it would be virtually impossible for the class members individually to effectively redress the wrongs done to them.

c)  Upon information and belief, there are no pending lawsuits concerning this controversy.

d)  It is desirable to concentrate the litigation of these claims in this forum since the acts complained of took place in this district and this forum is convenient to the parties, the class members, and the potential witnesses.  The resolution of the claims of all Class members in a single forum, and in a single proceeding, would be a fair and efficient means of resolving the issues raised in this litigation.

35

e)   Prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants.

f)   The class is specifically identifiable to facilitate provision of adequate notice and there will be no significant problems managing this case as a class action.

## FIRST CLAIM
### Unlawful Business Practices: Cal. Bus. & Prof. Code § 17200, et seq.
### Brought by Plaintiff and the Putative Class Against All Defendants

171.   The allegations in each Cause of Action are repeated and realleged in every other Cause of Action as if set forth in full therein.

172.   Defendants have engaged and continue to engage in unlawful, unfair, or fraudulent business practices within the meaning of Cal. Bus. & Prof. Code § 17200, causing injury to Plaintiff and the Class.

173.   Plaintiff has standing to pursue this claim as she has suffered injury in fact and has lost money or property as a result of Defendants' actions as set forth above.  Class members also have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth above.

174.   The violation of any law constitutes an "unlawful" business practice under Cal. Bus. & Prof. Code § 17200.

175.   Each Defendants' false representations alleged herein violates 21 U.S.C. § 343; 21 U.S.C. § 331; Cal. Civ. Code § 1709; Cal. Civ. Code § 1750 *et seq*.; Cal. Com. Code § 2313; Cal. Com. Code § 2315; and Cal. Bus. & Prof. Code § 17500 *et seq.*

176.   Each Defendants' false representations alleged herein also violates California's criminal laws.  Cal. Penal Code § 383 (forbidding the offering for sale food that is adulterated, e.g., "by any means it is made to appear better or of greater value than it really is").

177.   Each Defendants' false representations alleged herein also violates California's Sherman Food, Drug, and Cosmetic Law, which prohibits the advertising, manufacture, sale of adulterated and misbranded foods.   Cal. Health & Safety Code §§ 110390, 110395, 110398, 110400, 110550, 110585, 110620, 110625, 110660, 110705, 110740, 110760, 110765, and 110770.

36

178.  In addition to violating the statutes listed in the above paragraphs, PepsiCo also violated N.Y. Gen. Bus. Law § 392-b (false labels and misrepresentations punishable as a misdemeanor); N.Y. Gen. Bus. Law §§ 349-350 (deceptive trade practices).

179.  By violating these laws, Defendants engaged in unlawful business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, causing injury to Plaintiff and the Putative Class.

### SECOND CLAIM
**Unfair Business Practices: Cal. Bus. & Prof. Code § 17200, et seq.**
**Brought by Plaintiff and the Putative Class Against All Defendants**

180.  Defendants have engaged and continue to engage in unfair business practices within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*. causing injury to Plaintiff and the Putative Class.

181.  Through each of the false and misleading representations and omissions detailed more fully in the preceding paragraphs, Defendants have engaged and continue to engage in conduct that is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. Defendants' false and misleading representations and omissions also violate legislatively declared policy as they have violated numerous state and federal laws. Moreover, the gravity of the harm to Plaintiff and Class members resulting from Defendants' conduct outweighs Defendants' legitimate reasons, justifications and/or motives for engaging in such deceptive acts and practices.

### THIRD CLAIM
**Fraudulent Business Practices: Cal. Bus. & Prof. Code § 17200, et seq.**
**Brought by Plaintiff and the Putative Class Against All Defendants**

182.  Defendants have engaged and continue to engage in fraudulent business practices within the meaning of Cal. Bus. & Prof. Code § 17200, causing injury to Plaintiff and the Putative Class.

183.  Each false and misleading representation and omission constitutes fraudulent business practices under Cal. Bus. & Prof. Code § 17200 because the representations and omissions were false.  Even if these representations were true, Defendants' representations and deceptive

37

concealment were nonetheless fraudulent under the statute because they were misleading and were likely to and did deceive the reasonable consumer, including Plaintiff and the Class members.

**FOURTH CLAIM**
**False Advertising: Cal. Bus. & Prof. Code § 17500, *et seq*.,**
**Brought by Plaintiff and the Putative Class Against All Defendants**

184.   Defendants engaged in and disseminated advertising, including product package labels, television advertisements, magazine advertisements, internet advertisements, and other marketing from the State of California to the public and offered for sale Falsely Labeled Products on a nationwide basis, including in California.

185.   The misrepresentations and non-disclosures by Defendants of the material facts detailed above constitute false and misleading advertising, and therefore constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

**FIFTH CLAIM**
**Restitution Based On Quasi-Contract/Unjust Enrichment**
**Brought by Plaintiff and the Putative Class Against All Defendants**

186.   As a result of Defendants' wrongful, unfair and deceptive conduct, Plaintiff and the Class members have suffered a detriment while Defendants have received a benefit, as detailed above.

187.   Defendants have unjustly retained these benefits, and thereby have been unjustly enriched as a result of the deceptive representations and omissions alleged herein at the expense of Plaintiffs and the Class members, thereby creating a quasi-contractual obligation on Defendants to restore these ill-gotten gains to Plaintiffs and the Class.

188.   Under principles of equity and good conscience, Defendants should not be allowed to retain the money generated from the sale of the Falsely Labeled Products, which were unlawfully marketed, advertised, labeled, promoted, and sold to the Plaintiff and Class members.  To allow Defendants to retain the monies received from Plaintiff and the Class members would offend traditional notions of justice and fair play and induce companies to misrepresent key characteristics of their food products in order to increase sales.

189.  As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and the Class members are entitled to restitution or restitutionary disgorgement in an amount to be proved at trial.  The amount of restitution to which Plaintiffs and the Plaintiff Class are entitled should be measured by the extent of Defendants' unjust enrichment, including its unjustly acquired profits and other monetary benefits resulting from its wrongful conduct.

**SIXTH CLAIM**
**Breach of Express Warranty, State and Federal Law**
**Brought by Plaintiff and the Putative Class Against All Defendants**

190.  Defendants expressly warranted to Plaintiff and members of the Class on the package of the Falsely Labeled Products those representations listed above.

191.  These express warranties appear on each and every package of the Falsely Labeled Products.  These affirmations of fact or promises by Defendants relate to the good and became part of the basis of the bargain.

192.  Plaintiff and members of the Class purchased the Falsely Labeled Products, believing them to conform to the express warranties.

193.  Defendants breached the express warranties contained on the package of their Falsely Labeled Products.

194.  As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and the Class members did not receive goods as warranted.  Plaintiff and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.  Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above.  Moreover, had Plaintiff and the Class members known the true facts, they either would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Defendants charged for the products.

39

## SEVENTH CLAIM
### Breach of Implied Warranty of Merchantability, State and Federal Law
### Brought by Plaintiff and the Putative Class Against All Defendants

195.  Defendants impliedly warranted that the Falsely Labeled Products conformed to the promises or affirmations of fact made on the product labels detailed above.  Defendants thereby impliedly warranted that the products were merchantable.  Defendants did so with the intent to induce Plaintiffs and the Class members purchase the Falsely Labeled Products.

196.  Defendants breached their implied warranties in that the products did not comply with the promises and affirmations of fact made on the product labels detailed above.

197.  Defendants had prior knowledge and notice of the true nature of the Falsely Labeled Products and, therefore, its breach of the warranty, but took no action to remedy the inferiority or to cure the breach.

198.  As a direct and proximate result of Defendants'' breach of the implied warranty merchantability, Plaintiff and the Class members did not receive goods as impliedly warranted by Defendants to be merchantable.  Plaintiff and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.  Among other things, Plaintiff and members of the Class did not receive the benefit of the bargain and have suffered other injuries as detailed above.  Moreover, had Plaintiff and the Class members known the true facts, they either would not have purchased the products, would have purchased fewer products, or would not have been willing to pay the premium price Defendants charged for the products.

## EIGHTH CLAIM
### Fraudulent Misrepresentation, Fraudulent Concealment, and Constructive Fraud
### in Violation of Common Law and Cal. Civ. Code §§ 1709, 1573 *et seq*.
### Brought by Plaintiff and the Putative Class Against All Defendants

199.  On the package of the Falsely Labeled Products, Defendants falsely and fraudulently represented to the public, including Plaintiff and Class Members, those false representations listed above.  Defendants also fraudulently concealed from the public, including Plaintiff and Class Members, those material facts listed above.  These misrepresentations and omissions constitute deceit under Cal. Civ. Code § 1710.

40

200.  Defendants knew that these misrepresentations are false and that their omissions are fraudulent and deceptive, but nonetheless misrepresented and concealed these facts to induce Plaintiff and the Class members to act in reliance on the misrepresentations and omissions and purchase the Falsely Labeled Products.

201.  Defendants intentionally made the false representations and intentionally concealed and suppressed these material facts with the intent to defraud the Plaintiff and the Class.  Defendants made these false representations and omissions to make the Falsely Labeled Products appear more attractive to consumers.  Defendants knew and intended that Plaintiff and the members of the Class would rely on Defendants' representations and omissions and purchase the Falsely Labeled Products. Defendants thereby violated Cal. Civ. Code § 1709.

202.  Defendants were under a duty to disclose the omitted facts because (1) Defendants had a duty to correct the misinformation Defendants disseminated through advertising, marketing, and other promotion of the Falsely Labeled Products; and (2) Defendants were in possession of knowledge about the identity, formulation, and production of the Falsely Labeled Products and of their ingredients, and this information was not reasonably available to consumers.

203.  By not disclosing the material facts to Plaintiff and other members of the Class, Defendants breached this duty.

204.  Defendants gained an advantage by these fraudulent representations and omissions.

205.  These misrepresentations and omissions were material.  A reasonable person would attach importance to the existence or nonexistence of these representations in determining whether to purchase the Falsely Labeled Products.

206.  Plaintiff and the members of the Class necessarily, reasonably, and justifiably relied upon the Defendants' false representations and misleading omissions.  Plaintiff and the other Class members were unaware of the truth of these misrepresentations and these concealed facts and would have not acted as they did had they known the truth.

207.  Defendants made these fraudulent misrepresentations and omissions uniformly to each Class Member, by placing the same misrepresentation and omission prominently on each and

every package of the Falsely Labeled Products.  Thus, Plaintiff and each Class member were subjected to the same fraudulent advertising each time they purchased and ingested the Falsely Labeled Products.

208.  As a direct and proximate result of Defendants' fraud, Plaintiff and the Class members suffered actual damages in an amount not presently known, but which will be shown by proof at time of trial, including incidental and consequential damages, emotional distress and mental anguish, interest, and reasonable attorneys' fees.

209.  Plaintiff is informed and believes, and upon such information and belief alleges, that Defendants undertook the aforesaid illegal acts intentionally or with conscious disregard of the rights of Plaintiff and the Class, and did so with fraud, oppression, and malice. Therefore, Plaintiff and the Class are also entitled to punitive damages against Defendant.

### NINTH CLAIM
**Negligence and Negligent Misrepresentations**
**Brought by Plaintiff and the Putative Class Against All Defendants**

210.  Defendants had a duty to use due care in formulating, labeling, marketing, advertising, and selling its products.  Defendants breached that duty.  Defendants' false and misleading representations detailed above were negligently made without any reasonable grounds for believing it was true.

211.  Defendants made the negligent misrepresentations intending to induce consumers' reliance on the facts misrepresented and matters concealed.  Plaintiffs and other consumers saw, believed, and relied on Defendants' misrepresentations and, in justifiable reliance on them and as a result of them, purchased the Falsely Labeled Products.

212.  Defendants are also negligent due to their violation of statutes and regulations referenced above.  Their violation proximately caused Plaintiff and Class member's injury, their injury being the type that the statutes and regulations were designed to prevent, and these consumers being within the class of persons for whose protection the statutes and regulations were adopted.

213.  As a proximate and actual result of Defendants' negligence and negligent representations, Plaintiff and the Class have suffered damages in an amount not presently known, but which will

42

be shown by proof at time of trial, including incidental and consequential damages, physical

injury, medical monitoring, interest, and reasonable attorneys' fees.

### TENTH CLAIM
### Strict Liability for Defective Product
### Brought by Plaintiff and the Putative Class Against All Defendants

214.   Defendants are in the business of manufacturing, processing, distributing, selling, and

advertising food products, such as the Falsely Labeled Products, for consumption by the general

public.  Defendants caused these Falsely Labeled Products to be placed into the stream of

commerce and sold to the Plaintiff and other Class members while said products were defective.

215.   Plaintiff purchased and ingested Falsely Labeled Products on numerous occasions, doing

so in a manner that was reasonably foreseeable and intended by Defendants at the time the

products were manufactured, processed, distributed, and sold to Plaintiff and Class members.

216.   The Falsely Labeled Products were defective and unreasonably dangerous because such

products were in a condition not anticipated by the consumer.

217.   The Falsely Labeled Products were defective also because the synthetic substances, GMOs,

and non-juice ingredients would not be reasonably expected in the product.

218.   The Falsely Labeled Products were defective also in that the labeling of the Falsely

Labeled Products violated statutes and regulations referenced above.

219.   The defective condition existed at the time the product left each Defendant's control and,

further, Defendants knew or reasonably should have known of the condition at that time.

220.   As a proximate and actual result of the defective condition, Plaintiff and the Class

members have suffered damages in an amount not presently known, but which will be shown by

proof at time of trial, including incidental and consequential damages, physical injury, medical

monitoring, interest, and reasonable attorneys' fees.

1

2

**ELEVENTH CLAIM**
**Assault and Battery**
**Brought by Plaintiff and the Putative Class Against All Defendants**

221.  Defendants intended to and induced Plaintiff and the Class members to ingest the Falsely Labeled Products. Defendants thereby violated the Plaintiff's and the Class members' person.

222.  Plaintiff and the Class members did not know all material facts regarding the Falsely Labeled Products. Plaintiff and the Class members therefore did not consent to the bodily intrusion.

223.  Plaintiff and the Class members were offended and injured by Defendants' conduct. Plaintiff and the members of the Class:

    a)  ingested a substance that was other than what was represented by Defendants;

    b)  ingested a substance that Plaintiff and the members of the Class did not expect or give informed consent to;

    c)  ingested a product that was artificial, synthetic, not the vitamin claimed, GMO, not juice, or otherwise not natural;

    d)  ingested a product that did not bring the health benefits Defendants promised;

    e)  ingested a substance that is or is produced using a substance that is generally harmful to their health, their children's health, or their unborn fetus's health;

    f)  ingested a substance that is, contains, or is produced by a known or suspected toxin, carcinogen, hazardous substance, poses health or environmental risks, or otherwise is harmful to the environment and/or the factory workers that produce or process such substances;

    g)  ingested a substance that was of a lower quality than what Defendants promised;

224.  Defendants acted with wanton, willful, and reckless disregard for Plaintiff's and the Class members' rights.

225.  As a direct and proximate result of Defendants' assault and battery, Plaintiff and the Class members have suffered actual damages in an amount not presently known, but which will be shown by proof at time of trial, including incidental and consequential damages, emotional distress and mental anguish, interest, and reasonable attorneys' fees.

226.  Plaintiff is informed and believes, and upon such information and belief alleges, that Defendants undertook the aforesaid illegal acts intentionally or with conscious disregard of the

44

1   rights of Plaintiff and the Class, and did so with fraud, oppression, and malice. Therefore,

2   Plaintiff and the Class are also entitled to punitive damages against Defendant.

3                                  **TWELFTH CLAIM**
                                      **Conspiracy**
4      **Brought by Plaintiff and the Putative Class Against All Defendants**

5   227.  In committing the wrongful acts alleged herein, Defendants, including Defendants Does 1-

6   100, planned and participated in and furthered a common scheme by means of false, misleading,

7   deceptive, and fraudulent representations and omissions to induce Plaintiff, Class members, and

8   members of the public to purchase one or more Falsely Labeled Products.

9   228.  Defendants, upon becoming involved with the manufacture, distribution, advertising,

10  marketing, and sale of the Falsely Labeled Products knew or should have known that the claims

11  about these products are false, deceptive, and misleading.

12  229.  In addition to the wrongful conduct herein alleged as giving rise to primary liability,

13  Defendants further aided and abetted and knowingly assisted each other in breach of their

14  respective duties and obligations as herein alleged.

15                                     **PRAYER**

16  230.  As a result of the conduct described above, Defendants have been, and will continue to be,

17  unjustly enriched at the expense of Plaintiff and Class members.  Defendants have been unjustly

18  enriched by the profits they have obtained from Plaintiff and the Class from the purchases of

19  Falsely Labeled Products made by them, and the higher value of an "all natural foods" brand.

20  231.  As a result of the wrongful business practices described above, Plaintiff and the members

21  of the Class are entitled to an order awarding Plaintiff and the Class full restitution and

22  restoration of the money wrongfully acquired by Defendants by means of their deceptive

23  misrepresentations and omissions, in an amount to be proven at trial, plus interest and attorneys

24  fees, injunctive relief, and any other orders and judgments which may be necessary to disgorge

25  Defendants' profits or ill-gotten gains obtained and to restore any person in interest any money

26  paid for the Falsely Labeled Products as a result of the wrongful conduct of Defendants.

27  Otherwise, the Class will continue to be harmed by Defendants' deceptive acts and practices, and

28
                                         45

will be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

232.   The above-described deceptive practices of Defendants present a reasonable likelihood of deception to Plaintiff and members of the Class in that Defendants have systematically perpetrated and continue to perpetrate such acts or practices upon members of the Class by means of false, misleading, and deceptive misrepresentations and omissions on the packages of Falsely Labeled Products and other advertising and marketing.

233.   Such deceptive conduct is ongoing and continues to this date.  The above-described deceptive practices of Defendants are also likely to be repeated in the future.  The above-described deceptive practices of Defendants constitute a continuing course of conduct of unfair competition and present a continuing threat to consumers in that they will continue to mislead consumers.


**WHEREFORE**, Plaintiff, on behalf of herself and on behalf of the other members of the Class, requests award and relief as follows from each Defendant:

A.  An order **certifying** that this action is properly brought and may be maintained as a class action, that Plaintiff be appointed Class Representative and Plaintiff's counsel be appointed Class Counsel;

B.  A judgment awarding Plaintiff and the Plaintiff Class **damages** in an amount according to proof, including compensatory damages, lost expectancy, emotional distress and mental anguish, and medical monitoring;

C.  An order requiring Defendants to pay **statutory penalties** pursuant to the civil, criminal, and regulatory laws, for the benefit of the State or the Plaintiff Class, as appropriate;

D.  A judgment awarding Plaintiff and the Plaintiff Class **restitution** in an amount according to proof;

E.  Other equitable relief, including equitable accounting, disgorgement, restitution, constructive trust, and equitable estoppel;

46

F.   A judgment awarding Plaintiff and the Plaintiff Class **punitive** damages;

G.   Pre- and post-judgment interest.

H.   Attorneys' fees and expenses and the costs of this action;

I.   An order requiring an accounting for, and imposition of a constructive trust upon, all monies received by Defendants as a result of the unfair, misleading, fraudulent and unlawful conduct alleged herein;

J.   A declaratory judgment in favor of Plaintiff and the Plaintiff Class, under California law, New York law, and 28 U.S.C. §§ 2201-2202, stating that the synthetic substances listed above are not the vitamins Defendants claim them to be, and their inclusion in a beverage product renders the statement that the product as containing vitamins, natural boosts, and as being "all natural" and "100% juice" as false, deceptive, and misleading.

K.   A declaratory judgment in favor of Plaintiff and the Plaintiff Class, under California law, New York law, and 28 U.S.C. §§ 2201-2202, stating that the synthetic substances listed above are not "all natural," and their inclusion in a beverage product renders the statement that the product as "all natural" as false, deceptive, and misleading.

L.   A declaratory judgment in favor of Plaintiff and the Plaintiff Class, under California law, New York law, and 28 U.S.C. §§ 2201-2202, stating that the GMO ingredients listed above are not "non-GMO," and their inclusion in a beverage product renders the statement that the product as "non-GMO" as false, deceptive, and misleading.

M.   A declaratory judgment in favor of Plaintiff and the Plaintiff Class, under California law, New York law, and 28 U.S.C. §§ 2201-2202, stating that the non-juice ingredients listed above are not "100% juice," and their inclusion in a beverage product renders the statement that the product as "100% juice" as false, deceptive, and misleading.

N.   An order permanently enjoining Defendants' present and future wrongful conduct, including, but not limited to, an order:

   1)   Enjoining Defendants from continuing to make the false, deceptive, and misleading statements and omissions set forth above;

   2)   Enjoining Defendants from continuing to offer for sale any Falsely Labeled

Products that contain any false, misleading, and/or deceptive or unsubstantiated statements and claims on its packaging and/or label, including, without limitation, those statements and claims set forth above;

3) Enjoining Defendants from marketing, producing, or selling products that claim to be "all natural," "non-GMO," and/or "100% juice" when the product contains one or more synthetic, GMO, or non-juice substances including, without limitation, those substances identified above;

4) Enjoining Defendants from marketing, producing, or selling products that contains an ingredient falsely claimed to be a vitamin including, without limitation, those substances identified above;

5) Ordering that Defendants immediately recall any and all units of Falsely Labeled Products;

6) Enjoining Defendants from continuing to use the packaging and label that it presently uses for the Falsely Labeled Products;

7) Ordering Defendants to fully disclose the truth of its misrepresentations, including the nature, identity, and method of processing or manufacture of all ingredients in its Falsely Labeled Products, including the so-called "natural flavors;"

8) Any other orders or judgments as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition; and

9) Any other orders and judgments as may be necessary to prevent Defendants' use or employment of the deceptive practices set forth above.

O.  Such other and further relief as may be deemed necessary or appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and/or issues so triable.

Dated: September 26, 2011

FLASHPOINT LAW, INC.
Shirish Gupta

By: _____
    Shirish Gupta
*and*

THE GOLAN LAW FIRM
YVETTE GOLAN
1919 Decatur St.
Houston, TX 77007
Telephone: (866) 298 4150 ext 101

Attorneys for Plaintiff SARA SANDYS

48

FLASHPOINT LAW, INC.
SHIRISH GUPTA (SBN 205584)
1900 S. Norfolk Street, Suite 350
San Mateo, CA 94403
Telephone: (650) 539-4019
sgupta@flashpointlaw.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA SANDYS | CASE NUMBER |
| PLAINTIFF(S) | CV11-08007 JAK (PLAx) |
| v. | |
| NAKED JUICE COMPANY, a California corporation; PEPSICO INC., a New York corporation; and DOES 1-10 | |
| | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): NAKED JUICE COMPANY; PEPSICO INC.

A lawsuit has been filed against you.

Within __2 1__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, SHIRISH GUPTA _____, whose address is 1900 S. NORFOLK STREET, SUITE 350, SAN MATEO, CA 94403 _____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

SEP 2 7 2011

Clerk, U.S. District Court

Dated: _____

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

FLASHPOINT LAW, INC.
SHIRISH GUPTA (SBN 205584)
1900 S. Norfolk Street, Suite 350
San Mateo, CA 94403
Telephone: (650) 539-4019
sgupta@flashpointlaw.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| SARA SANDYS | CASE NUMBER |
| | CV11-08007 JAK (PLAx) |
| PLAINTIFF(S) | |
| v. | |
| NAKED JUICE COMPANY, a California corporation; PEPSICO INC., a New York corporation; and DOES 1-10 | **SUMMONS** |
| DEFENDANT(S). | |

TO:   DEFENDANT(S): <u>NAKED JUICE COMPANY; PEPSICO INC.</u>

A lawsuit has been filed against you.

Within _ 2.1 _ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, <u>SHIRISH GUPTA</u>, whose address is <u>1900 S. NORFOLK STREET, SUITE 350, SAN MATEO, CA 94403</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

SEP 2 7 2011

Clerk, U.S. District Court

JULIE PRADO    SEAL

Dated: _____

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself □) | DEFENDANTS |
|---|---|
| SARA SANDYS | NAKED JUICE COMPANY, a California corporation; PEPSICO INC., a New York corporation and DOES 1-10' |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) THE GOLAN LAW FIRM, YVETTE GOLAN; 1919 Decatur St., Houston, TX FLASHPOINT LAW, INC.; SHIRISH GUPTA, 1900 S. Norfolk Street, Suite 350, San Mateo, CA 94403; (650) 539-4019 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

□ 1 U.S. Government Plaintiff   □ 3 Federal Question (U.S. Government Not a Party)

□ 2 U.S. Government Defendant   ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | □ 1 | □ 1 | Incorporated or Principal Place of Business in this State | □ 4 | ☑ 4 |
| Citizen of Another State | ☑ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   □ 2 Removed from State Court   □ 3 Remanded from Appellate Court   □ 4 Reinstated or Reopened   □ 5 Transferred from another district (specify):   □ 6 Multi-District Litigation   □ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   □ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes   □ No      □ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. 1332(d); Unfair Business Business Practices in violation of California B&P Code section 17200 et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| □ 400 State Reapportionment | □ 110 Insurance | □ 310 Airplane | □ 370 Other Fraud | □ 510 Motions to Vacate Sentence Habeas Corpus | □ 710 Fair Labor Standards Act |
| □ 410 Antitrust | □ 120 Marine | □ 315 Airplane Product Liability | □ 371 Truth in Lending | | □ 720 Labor/Mgmt. Relations |
| □ 430 Banks and Banking | □ 130 Miller Act | □ 320 Assault, Libel & Slander | □ 380 Other Personal Property Damage | □ 530 General | □ 730 Labor/Mgmt. Reporting & Disclosure Act |
| □ 450 Commerce/ICC Rates/etc. | □ 140 Negotiable Instrument | □ 330 Fed. Employers' Liability | □ 385 Property Damage Product Liability | □ 535 Death Penalty □ 540 Mandamus/ Other | □ 740 Railway Labor Act |
| □ 460 Deportation | □ 150 Recovery of Overpayment & Enforcement of Judgment | □ 340 Marine | BANKRUPTCY | □ 550 Civil Rights | □ 790 Other Labor Litigation |
| □ 470 Racketeer Influenced and Corrupt Organizations | □ 151 Medicare Act | □ 345 Marine Product Liability | □ 422 Appeal 28 USC 158 | □ 555 Prison Condition | □ 791 Empl. Ret. Inc. Security Act |
| □ 480 Consumer Credit | □ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | □ 350 Motor Vehicle | □ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| □ 490 Cable/Sat TV | | □ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | □ 610 Agriculture | □ 820 Copyrights |
| □ 810 Selective Service | □ 153 Recovery of Overpayment of Veteran's Benefits | □ 360 Other Personal Injury | □ 441 Voting | □ 620 Other Food & Drug | □ 830 Patent |
| □ 850 Securities/Commodities/ Exchange | □ 160 Stockholders' Suits | □ 362 Personal Injury- Med Malpractice | □ 442 Employment | □ 625 Drug Related Seizure of Property 21 USC 881 | □ 840 Trademark |
| □ 875 Customer Challenge 12 USC 3410 | □ 190 Other Contract | □ 365 Personal Injury- Product Liability | □ 443 Housing/Acco- mmodations | | SOCIAL SECURITY |
| □ 890 Other Statutory Actions | □ 195 Contract Product Liability | □ 368 Asbestos Personal Injury Product Liability | □ 444 Welfare | □ 630 Liquor Laws | □ 861 HIA (1395ff) |
| □ 891 Agricultural Act | □ 196 Franchise | | □ 445 American with Disabilities - Employment | □ 640 R.R. & Truck | □ 862 Black Lung (923) |
| □ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | □ 446 American with Disabilities - Other | □ 650 Airline Regs | □ 863 DIWC/DIWW (405(g)) |
| □ 893 Environmental Matters | □ 210 Land Condemnation | □ 462 Naturalization Application | | □ 660 Occupational Safety /Health | □ 864 SSID Title XVI |
| □ 894 Energy Allocation Act | □ 220 Foreclosure | □ 463 Habeas Corpus- Alien Detainee | □ 440 Other Civil Rights | □ 690 Other | □ 865 RSI (405(g)) |
| □ 895 Freedom of Info. Act | □ 230 Rent Lease & Ejectment | □ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| □ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | □ 240 Torts to Land | | | | □ 870 Taxes (U.S. Plaintiff or Defendant) |
| □ 950 Constitutionality of State Statutes | □ 245 Tort Product Liability □ 290 All Other Real Property | | | | □ 871 IRS-Third Party 26 USC 7609 |

CV11-08007

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)   CIVIL COVER SHEET   Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
                        ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                        ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                        ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Texas |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | New York |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
    **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | Texas |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
**Note: In land condemnation cases, use the location of the tract of land involved**

X.  SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date September 27, 2011

    **Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |